**E-Filed 9/27/2010**

1

2

3

4

5

6

7         **IN THE UNITED STATES DISTRICT COURT**

8      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9              **SAN JOSE DIVISION**

10

11

12   JAVIER ZAMORA,                        Case Number 5:09-cv-3273-JF/PVT

13                        Plaintiff,        ORDER[1] GRANTING PLAINTIFF'S
                                            MOTION FOR SUMMARY JUDGMENT;
14           v.                             DENYING DEFENDANT'S MOTION FOR
                                            SUMMARY JUDGMENT; AND
15   MICHAEL J. ASTRUE,                     REMANDING FOR CALCULATION OF
     Commissioner of Social Security,       BENEFITS
16
17                        Defendant.

18

19                        **I.  BACKGROUND**

20        Plaintiff Javier Zamora ("Zamora") filed this action on July 17, 2009, appealing the

21   denial of disability insurance benefits and supplemental security income by Defendant

22   Commissioner of Social Security (the "Commissioner").[2]  The parties have filed cross-motions

23   for summary judgment.  For the reasons set forth below, Zamora's motion will be granted, and

24   _____

25        [1] This disposition is not designated for publication in the official reports.

26        [2]The challenged decision was rendered by Administrative Law Judge Brenton L.
27   Rogozen ("the ALJ") on January 12, 2009.  The ALJ's decision became final on May 29, 2009,
     when the Appeals Council of the Social Security Administration denied Plaintiff's request for
28   administrative review of the decision.

1   the Commissioner's motion will be denied.  The case will be remanded to the ALJ for

2   calculation of benefits.

3   **A. Zamora's Medical History**

4         The following facts are taken from the ALJ's decision dated January 12, 2009, and the

5   accompanying Administrative Record ("AR").  At the time of the  hearing before the ALJ,

6   Zamora was forty-one years old.  AR 36, 48.  He attended school in Mexico through the sixth

7   grade and can read and write in Spanish, but he cannot read, write, or speak English.  AR 63.  He

8   immigrated to the United States in the 1980s and recorded four quarters of Social Security

9   coverage each year from 1984 through 2004.  AR 107.  From 1991 until his injury in 2004,

10  Zamora worked as an installer for Ponzini Insulation, earning more than $48,000 in both 2002

11  and 2003.  AR 58, 92.

12        Zamora claims that he injured his lower back while working on March 26, 2004.  AR 52.

13  He initially sought treatment from a chiropractor, Aaron Hughes, who indicated that his

14  "[h]istory, examination and clinical course are consistent with disc herniation."  AR 184.

15  Zamora was referred to Dr. Jay A. Kaiser, who performed an MRI of his lumbar spine on June 3,

16  2004.  AR 187.  Dr. Kaiser's findings indicated "no evidence of herniation" at the L3-4 level or

17  the L5-S1 level; the report does, however, find a "small central extrusion" at the L4-5 level.[3]  *Id.*

18        Zamora then was referred to Dr. Felicia Radu, a board-certified specialist in physical

19  medicine and rehabilitation; Dr. Radu's treatment included two epidural steroid injections that

20  provided no relief and an initial course of physical therapy that Zamora claims exacerbated his

21  injury. AR 197, 214, 325.  When his symptoms had not improved by February 2005, Zamora

22  was sent to Dr. Willard B. Wong, an orthopedic surgeon, who diagnosed "sequestered L4-L5

23  _____

24        [3]Dr. Kaiser's impressions, organized by intervertebral disk, were recorded as follows:
        1. Bilateral spondylolysis, L5, with slight spondylolisthesis, L5-S1.  Moderate

25      bilateral foraminal stenosis.  Disc degeneration without evidence of herniation.
        2. At the L4-5 level, there is disc dessication.  There is a small central extrusion

26      with mild caudal migration of the midline.  Only mild effacement o the central
        aspect of the thecal sac.

27      3. Mild degeneration of the L3-4 discs.
        AR 187.

28

disk herniation," and recommended a multilevel diskogram. AR 197-99. The diskogram, which was performed by Dr. Sherman N. Tran, revealed evidence of an "annular tear at L4/5 and L5/S1 and disc protrusion at all levels." AR 191. Dr. Tran indicated that any surgery should be undertaken with "great caution" because of the "multilevel discogenic pathology." AR 195. Dr. Wong concurred, indicating that "symptoms are not likely to significantly improve with formal lumbar interbody fusion," and recommending continued nonoperative care with Dr. Radu. AR 192-93.

Zamora continued to receive treatment from Dr. Radu and began a second round of physical therapy under the care of Dr. Allen Kaisler-Meza in June 2006, but treatment was discontinued in August of the same year because Zamora reported no appreciable improvement in his level of function or pain. AR 219. Zamora has also been diagnosed with gastritis related to nonsteroidal anti-inflammatory drugs (NSAIDs) which has "complicated" his care. AR 324, 343. He continues to receive treatment for pain management.

In August 2005, Dr. Radu reported that Zamora was permanent and stationary with a ten-percent whole person disability and could not return to his previous employment; she indicated that Zamora could lift ten pounds frequently and could lift twenty pounds occasionally, could stand and walk fewer than six hours per eight hour work day, and could sit fewer than two hours. In October 2006, Dr. K.M. Quint, reviewing physician for the California Department of Developmental Services, made a residual functional capacity assessment based on record evidence.[4] AR 271. Dr. Quint indicated that his findings were not significantly different from the conclusions of the treating and examining sources, though he did note that "pain was considered" in the conclusions of the examining sources. AR 275. Dr. Quint also indicated that Zamora could lift ten pounds frequently, only could lift twenty pounds occasionally, and that he

---

[4]Dr. Quint's report indicates under "significant objective findings" both a "06/04 MRI" and a "06/06 MRI" listing similar results. AR 277. There is no other evidence in the record that this second MRI was ever performed. In fact, both the ALJ's decision and Dr. Jensen's medical testimony highlight the fact that there was a single MRI conducted in 2004. *See* AR 18 ("The record does not indicate that additional MRI's were requested to monitor any changes in the claimant's condition since 2004"); *see also* AR 59.

3

1   could stand or walk about six hours in an eight hour day; he did indicate, however, that Zamora

2   could sit for six hours.  AR 272.  His assessment was confirmed summarily by Dr. L. Bobba in

3   April 2007.  AR 291.

4          In January 2007, Dr. Kaisler-Meza reported that Zamora only rarely could lift twenty

5   pounds and occasionally could lift ten, and that he only could sit or stand and walk for about four

6   hours in an eight hour workday.  AR 299.  In February 2008, Dr. Richard Gravina, examining

7   Zamora at the joint request of Zamora and the State Compensation Insurance Fund, indicated

8   that Zamora had a twenty-two percent whole person impairment based on the range of motion

9   method and should be considered a qualified injured worker.  AR 342.  Finally, Dr. Jensen, the

10  medical expert who testified before the ALJ, concluded, based on the record, that Zamora could

11  lift more than ten pounds occasionally and less than ten pounds frequently, could sit six hours in

12  an eight hour day, and could stand and walk a total four hours.  AR 61.  Dr. Jensen noted that Dr.

13  Kaisler-Meza's assessment was "quite restrictive" and "not completely appropriate in [his]

14  opinion."  AR 60.

15  **B.  Procedural History**

16         On July 19, 2006, Zamora filed an application for disability insurance benefits and

17  supplemental security income.  AR 13.  Both claims were denied initially and upon

18  reconsideration.  *Id.*  After a hearing on August 19, 2008, the ALJ determined that Zamora was

19  not disabled under the Social Security Act.  AR 21.

20         The ALJ explained that the Social Security Administration has established a five-step

21  sequential evaluation process for determining whether an individual is disabled under 20 CFR §§

22  404.1520(a) and 416.920(a).  AR 14. At step one, the ALJ concluded that Zamora had "not

23  engaged in substantial gainful activity since March 26, 2004."  AR 15.  At step two, the ALJ

24  found that Zamora's lumbar degenerative disc disease and chronic pain syndrom constituted

25  severe impairments under 20 CFR §§ 404.1521 *et seq.* and 416.971 *et seq.*  *Id.*  At step three,

26  however, the ALJ concluded that Zamora did not have an impairment or combination of

27  impairments that met or medically equaled one of the impairments in 20 CFR Part 404, Subpart

28  P, Appendix 1."  *Id.*  Despite this, the ALJ did find under the fourth step of the analysis that

4

1   Zamora is unable to continue to perform any past relevant work.  AR 20.  Finally, at step five,

2   the ALJ found that Zamora's residual functional capacity–which the ALJ deemed to include

3   sitting six hours of an eight hour workday–left him able to perform jobs that exist in significant

4   numbers in the national economy.  *Id.*  The vocational expert's opinion on which the ALJ relied

5   indicated that Zamora could perform the sedentary portion of assembly jobs.  AR 63.  The expert

6   further testified that if the findings of Dr. Kaisler-Mesa's report on Zamora's limitations were

7   credited, Zamora would not be able to perform such assembly work.  AR 65.  Based on these

8   determinations, the ALJ concluded that Zamora was not disabled as defined by the Social

9   Security Act at any time through the date of his decision.  AR 21.

10   Zamora's request for review of the opinion by the Social Security Administration's

11   Appeals Council was denied.  Zamora now challenges the ALJ's determination of his residual

12   capabilities on grounds that the ALJ (1) misstated the medical evidence, (2) erred in finding that

13   Zamora was not credible, and (3) failed to consider all of Zamora's impairments.

## II.  LEGAL STANDARD

15   Pursuant to 42 U.S.C. § 405(g) (2006), the Court has the authority to review the

16   Commissioner's decision denying Zamora's benefits.  The Court must affirm the ALJ's decision

17   if it determines that substantial evidence supports the ALJ's findings and that the ALJ applied

18   the correct legal standards.  *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995); *Drouin v.*

19   *Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  In this context, the term "substantial evidence"

20   means "more than a mere scintilla but less than a preponderance—[it] is such reasonable

21   evidence that a reasonable mind might accept as adequate to support the conclusion."  *Moncada*,

22   60 F.3d at 523; *see also Drouin*, 966 F.2d at 1257.  Where evidence exists to support more than

23   one rational interpretation, the Court must defer to the ALJ's decision.  *Moncada*, 60 F.3d at

24   523; *Drouin*, 966 F.2d at 1258.  However, the Court must consider "the entire record as a whole

25   and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v.*

26   *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted).  The Court

27   reviews only the reasons provided by the ALJ in disability determinations and may not affirm on

28   grounds upon which the ALJ did not rely.  *Orn v. Astrue*, 495 F.3d 625 (2007).

5

### III. DISCUSSION

**A. Whether the ALJ Properly Rejected the Medical Opinions of Dr. Gravina, Dr. Kaisler-Meza, and Dr. Radu.**

The ALJ's decicion "gives little weight" to the medical opinions of Zamora's treating physicians, Dr. Kaisler-Meza and Dr. Radu, as well as that of Dr. Gravina, who examined Zamora as an Agreed Medical Examiner. Zamora argues that the ALJ erred in failing to credit these opinions without providing specific and legitimate reasons supported by substantial evidence for rejecting them. AR 18-19. The Court agrees.

In determining whether a claimant is disabled, the ALJ must consider each of the medical opinions in the record together with the rest of relevant evidence. 20 C.F.R. § 416.927(b). Generally, "opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 416.927(d)(1)-(2)). To reject the uncontradicted opinion of a treating or examining physician, an ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Commissioner*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). Even if a treating or examining doctor is contradicted, the ALJ may not reject the opinion without providing "specific and legitimate reasons" supported by substantial evidence. *Id.* When a reviewing physician relies on the same clinical findings as a treating physician but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." *Orn*, 495 F.3d at 632.

Here, a narrow but crucial aspect of the medical testimony regarding Zamora's residual capacity is contested. The ALJ determined that, despite having severe impairments that make him unable to perform his past relevent work, Zamora has the residual functional capacity to perform jobs that exist in significant numbers in the national economy. The ALJ relied on the opinions of reviewing physicians Dr. Quint and Dr. Jensen while rejecting the conclusions of Zamora's treating and examining physicians. The treating physicians determined that Zamora could not sit for more than four hours in an eight hour workday (Dr. Radu indicated that Zamora

6

could sit fewer than two hours), while Drs. Quint and Jensen concluded that he could sit for six hours.[5]   AR 61, 272, 299, 331.  There is some discrepancy regarding postural limitations as well: Dr. Quint indicated that Zamora could perform frequent kneeling, reaching and crawling, while Dr. Radu concluded that he could kneel and reach only occassionaly and never should crawl.  AR 61, 272, 331.  These differences, while narrow, appear to be dispositive of the disability determination: the vocational expert testified that the ALJ's determination of Zamora's residual capacity, based the assessments of the reviewing doctors, left Zamora capable of performing significant assembly work, while if Dr. Kaisler-Meza's report were credited there would not be significant work Zamora could perform.  AR 63.

The conclusions of Drs. Quint and Jensen are not themselves substantial evidence upon which to reject the opinions of the treating and examining physicians.  Although these reviewing physicians arrived at different conclusions with respect to some of Zamora's residual physical capacities, they relied on the same clinical findings.  Dr. Quint indicated specifically that his findings were not significantly different than those of the  treating or examining sources.  AR 275.  While Dr. Jensen testified that Dr. Kaisler-Meza's report was not completely appropriate, he did not articulate any actual errors in the clinical findings.  AR 60.  Accordingly, the  ALJ, was entitled to disregard the opinions of Drs. Radu, Kaisler-Meza, and Gravina, only by providing "specific and legitimate reasons" for doing so, supported by substantial evidence.

## 1.    Dr. Gravina's Opinions

The Court begins its analysis with the ALJ's rejection of Dr. Gravina's opinions, or that determination raises issues relevant to the other medical opinions.  Dr. Gravina's opinions were "given little weight" by the ALJ based on the conclusion that they were "not consistent with the

---

[5]It should be noted that many of the conclusions of the physicians are consistent: all indicated that Zamora only occasionally can lift more than ten pounds, and all have indicated that he is limited to occasional climbing, stooping, and crouching.  AR 61, 272, 299, 331.  Nor are the treating physicians' assessments universally more generous: Dr. Radu indicated that Zamora could stand and walk for up to six hours a day, while Dr. Jensen concluded that the limit was four hours, and Dr. Jensen concluded that Zamora occasionally could lift no more than ten pounds while the treating physicians indicated that he occasionally could lift twenty.  AR 61, 331.

7

1  medical record as a whole." AR 18. In particular, Dr. Gravina's report states that Zamora's

2  June 3, 2004, MRI was "interpreted as demonstrating disc herniation with central extrusion at

3  L4-L5." AR 342. The ALJ rejected this interpretation, at least in part, because he surmised that

4  Dr. Gravina made his assessment "without seeing the actual MRI report," and because the MRI

5  report did not actually diagnose "disc herniation with central extrusion at L4-5." AR 18.

6  However, both the findings and the impressions recorded in the MRI report analyze each

7  intervertebral disc separately. AR 187. While the findings indicate "[a]t the L3-4 level . . . . no

8  evidence of herniation" and "[a]t the L5-S1 level . . . . no evidence of herniation," "[a]t the L4-5

9  level," they indicate "a small central extrusion, which causes mild effacement of the central

10 aspect of the thecal sac and has mild caudal migration." *Id.* The impression section similarly

11 distinguishes by intervertebral disc, describing each in a numbered paragraph. *See supra* note 3.

12 In paragraph one, discussing the L5-S1 disk (and L5 vertebra), the report notes "disc

13 degeneration without evidence of herniation," but in paragraph two, discussing the L4-5 level,

14 the report again indicates "a small extrusion with mild caudal migration of the midline." *Id.*

15 In his summary of the MRI report, and apparently in his analysis of the evidence, the ALJ

16 did not distinguish between the paragraphs relating to the different discs, instead grouping all of

17 the impressions in an undifferentiated list. AR 15, 18. This approach appears to have led the

18 ALJ to take the statement in paragraph one, indicating "[d]isc degeneration without evidence of

19 herniation" at the L5-S1 level, as applying to all discs, which ignored the fact that "central

20 extrusion" indicated at L4-5 is a specific form of herniation.[6] Dr. Gravina's statement that the

21 MRI showed "disc herniation with central extrusion L4-5" is amply supported in the record.

22 *See, e.g.,* AR 59 (testimony of medical expert Dr. Jensen reporting that "[s]ome herniation . . . is

23

24 [6]Zamora directs the Court's attention to the *Merck Manual of Diagnosis and Therapy*, Merck Reserach Labratories (17th ed. 1999), which defines *herniated nucleus pulposus*

25 (herniated, ruptured or prolapsed disk) as "prolapse of the central area of an intervertebral disk through the surrounding annulus," which occurs when there is *"protrusion* or rupture of the

26 nucleus through the annulus fibrosus" displacing the nucleus into the extradural space. *Id.* (emphasis added); Pl.'s MSJ at 7. While the Commissioner correctly notes that it is not the

27 Court's role to "weigh the evidence first hand," Def.'s MSJ at 8, it is the Court's obligation to

28 determine whether the ALJ's reasoning is consistent with the evidence in the record.

8

Case No. 5: 09-cv-3273 JF/PVT
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, ETC.
(JFLC3)

1 | evidenced by physical examination and an MRI"), AR 198 (report of Dr. Wong decribing the
2 | MRI as showing "left paramedian focal disk extusion that has migrated slightly caudal to the
3 | disk space. . . . about 3 to 4 mm in diameter" and diagnosing "sequestered L4-L5 disk
4 | herniation").  It is also consistent with May 2005 discogram indicating disc protrusion at L3/4,
5 | L4/5, and L5/S1.  AR 191.  The ALJ's reason for dismissing an opinion does not constitute a
6 | "specific, clear and convincing reason[]" where it is unsupported by or contradicted by evidence
7 | in the record.  *Murray v. Apfel*, No. 98-35800, 2000 U.S. App. LEXIS 190, *7-*8 (9th Cir. Jan.
8 | 4, 2000).

9 | The ALJ also discounted Dr. Gravina's opinions because Dr. Gravina "appears to have
10 | accepted the claimant's subjective complaints" and to have acted as an "advocate" for Zamora.
11 | However, the suggestion of partiality rings hollow with respect to Dr. Gravina, an Agreed
12 | Medical Examiner jointly requested by Zamora and the State Compensation Insurance Fund.
13 | AR 340.  Moreover, the Ninth Circuit has made clear that "an ALJ does not provide clear and
14 | convincing reasons for rejecting an examining physician's opinion by questioning the credibility
15 | of the patient's complaints where the doctor does not discredit those complaints and supports his
16 | ultimate opinion with his own observations."  *Ryan*, 528 F.3d at 1199-1200.  Here, Dr. Gravina
17 | relied on his own clinical observations as well as the MRI and discogram.  AR 342-43.

18 | The ALJ also gave little weight to Dr. Gravina's opinions because Dr. Gravina did not
19 | offer any opinion regarding Zamora's actual capacity to lift, carry, walk, stand, or sit.  *Id.*  By
20 | itself this is not a clear and convincing reason to reject an examining physician's opinion.
21 | Although it does not articulate specific limitations to particular activities, Dr. Gravina's report is
22 | not lacking in particulars, and his analysis of Zamora's diagnosis and his limited range of motion
23 | are relevant to the "nature and extent of [Zamora's] physical limitations."  20 C.F.R. §
24 | 404.1545(b).  Even if Dr. Gravina's report were not relevant to the ALJ's determination of
25 | residual capacity, it still should have been credited as corroborating the medical assessments of
26 | Drs. Radu and Kaisler-Meza.

27
28

Case No. 5: 09-cv-3273 JF/PVT
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, ETC.
(JFLC3)

**2. Dr. Radu's Opinions**

The ALJ gave little weight to Dr. Radu's conclusions because he determined that they also were "not consistent with the medical record as a whole." AR 16. The ALJ stated that the "objective laboratory reports and X-rays in this matter" were not consistent with the "extremely reduced level of activity described by the doctor." AR 16. However, as discusssed above, the ALJ apparently misinterpreted the MRI report, casting doubt on his assessment of the medical record. The ALJ also did not mention the fact that Dr. Quint appeared to rely on a *2006* MRI that is not part of the record and likely does not exist. *See supra* note 4. Both Zamora's testimony that his injury was exacerbated by the initial course of physical therapy and the evidence of protrusion at all three levels in the 2005 discogram indicate that Zamora's condition likely deteriorated subsequent to the 2004 MRI. AR 191, 197. If Dr. Quint erroneously believed that there was a later MRI showing less herniation, that error likely affected his analysis.

According to the ALJ, Dr. Radu reported in 2006 that Zamora "does not have radicular low back pain." *Id.* However, the report at issue diagnosed Zamora with "chronic lumbar facet syndrom," which is a cause of "nonradicular back pain." AR 324-25. The report noted an absence of "radicular impingement," *id.*, but that is not equivalent to absence of radicular back pain. Nor is there a "clear and convincing reason" to disregard Dr. Radu's uncontroverted diagnosis of *nonradicular* back pain. That diagnosis is corroborated by Dr. Gravina's assessment based on the MRI, noting that herniation with central extrusion at L4-5 "is distinctly abnormal and demonstrates an anatomic substrate that may be associated with chronic and recalcitrant lumbar symptomology." AR 342.

Finally, the ALJ finds that Dr. Radu's assessment of Zamora's residual capacity was inconsistent with her determination that Zamora had a ten percent whole person disability, was released to "light" activities, and was permanent and stationary. The ALJ does not explain why the findings are incompatible, nor does he identify substantial evidence in the record to support such a conclusion.

Case No. 5: 09-cv-3273 JF/PVT
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, ETC.
(JFLC3)

**3.  Dr. Kaisler-Meza's  Opinions**

The ALJ gave little weight to Dr. Kaisler-Meza's medical opinions because he believed that the opinions were not consistent with the medical record as a whole or with Dr. Kaisler-Meza's own examination and treatment notes.  In particular, the ALJ noted that Dr. Kaisler-Meza reported in a July 2007 questionnaire that Zamora's straight leg raising test was positive for pain at sixty degrees on the right, while the doctor's July 2007 progress report stated that the straight leg raise maneuver was negative.  AR 17.

Dr. Kaisler-Meza's observation that Zamora's straight leg raising test was negative at sixty percent on the right does appear to be in conflict with the terse statement in his July 2007 progress report that "the straight leg raise manuever is negative."  AR 305.  However, the observation is consistent with Dr. Kaisler-Meza's other reports,  AR 316, as well as those of Dr. Wong, *see* AR 198 ("Straight leg raises are negative on the left at 80 degrees for any significant pain") and Dr. Gravina, *see* AR ("Straight leg raising test is positive at 40 degrees bilaterally").  The Court must examine the record as a whole and not simply isolate a specific quantum of supporting evidence.  *Robbins*, 466 F.3d at 882.  Dr. Kaisler-Meza's statement is consistent with the remainder of the clinical record, and the inconsistency of a single statement is insufficient to undermine his credibility.

**B.  Whether the ALJ Erred in Failing to Credit Zamora's Account of Pain.**

The ALJ properly articulated the two-step process for considering a claimant's symptoms.  First, he had to determine whether there was an underlying medically determinable physical impairment that reasonably could produce the claimant's pain.  20 C.F.R. §§ 404.1529, 404.929.  Second, he had to evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. *Id.*  Importantly, however, once an impairment is medically established, an ALJ cannot require medical corroboration of the claimant's testimony support to prove the *severity* if the pain. *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995).  The ALJ cannot discount a claim of "excess pain" without making specific findings as to why the claimant's testimony of excess pain is not credible.  *Id.*  In the absence of "affirmative evidence" that the

11

1   claimant is a malingerer, the ALJ must provide reasons for rejecting the claimant's testimony

2   that are "clear and convincing." *Orn*, 495 F.3d at 635.

3       While correctly outlining the standard, the ALJ's decision does not discuss the the first

4   step of the analysis, and with respect to the second step, it merely sets forth conclusions without

5   providing specific findings supported by record evidence. There is no question that Zamora has

6   a medically established impairment. Both the MRI and discogram indicate disc herniation and

7   degeneration, with the discogram specifically indicating "[p]ainful discs at L3/4, L4/5, and

8   L5/S1. AR 187, 191. The issue is not whether there is an impairment that reasonably could be

9   expected to cause *some* pain, *see Fair v. Bowen*, 885 F.2d 597 (9th Cir. 1989), but whether

10  Zamora's testamony as to the amount of pain he suffered is credible.

11      The ALJ cites no "affirmative evidence" that Zamora is a malinger. Indeed, both of

12  Zamora's treating physicians, as well as Dr. Gravina, credited Zamora's description of his pain.

13  AR 16-18. As a result, the ALJ was required to make specific findings for not crediting

14  Zamora's account. The ALJ's decision states that there were discrepancies between the

15  claimant's assertions and (1) "the degree of medical treatment (including medications) sought

16  and obtained," (2) "the diagnostic tests and findings made on examination," (3) "the level of

17  restrictions on the claimant in most of the physicians opinions of record," and (4) "the level of

18  follow-up treatment, including diagnostic testing, ordered by the treating physicians." AR 19.

19  However, none of these statements is supported by a citation to the record and, in any event, as

20  discussed previously, it appears that the ALJ erred in interpreting the MRI report.

21      Nor does the record contain evidence as to treatment options that Zamora and his

22  physicians did not pursue. Zamora did consult Dr. Wong, an orthropedic surgeon, who

23  determined that surgery was not a viable option because of the disc protrusion on three levels.

24  AR 195; *see also* AR 191 (report of Dr. Tran indicating that any "intradiscal intervention"

25  should be performed with "great caution"). In contrast to the situation in *Parra v. Astrue*, 481

26  F.3d 742, 750-51 (9th Cir. 2007), which holds that at least in some instances "conservative

27  treatment" is sufficient to discount claimant's testimony regarding severity of pain, conservative

28  treatment was ordered in this case despite Zamora's expressed interest in surgery because the

12

1  surgery was not appropriate given Zamora's multilevel discogenic pathology. AR 191, 199.

2      Zamora also participated in physical therapy, which he testified exacerbated his injury.

3  AR 197, 214. As to medication, Zamora was unable to continue taking anti-inflammatory

4  medication after being diagnosed with gastritis. AR 213, 301. Zamora continues to receive

5  significant medication for pain. *See, e.g.*, AR 336. Although the ALJ relies upon the

6  physicians' failure to perform additional testing despite Zamora having been deemed permanent

7  and stationary, Dr. Radu indicated that additional testing was neither necessary nor indicated

8  given the diagnosis. AR 325.

9  **C. Whether the ALJ Failed to Consider All of Zamora's Impairments**

10     Zamora argues that the ALJ failed to consider his additional impairment of gastritis as

11 required by Social Security regulations. The regulations do require that the ALJ consider both

12 severe and nonsevere impairments in determining redisidual functional capacity. 20 C.F.R. §

13 1545(a)(2). Here, however, the ALJ did make a note of Zamora's "stomach and gastrointestinal

14 problems," though he did not mention gastritis specifically. AR 18. Zamora cites no authority

15 holding that each impairment be addressed independently or given a particular weight. In

16 *Celaya v. Halter*, 32 F.3d 1177 (9th Cir. 2003), on which Zamora relies, the court made clear

17 that the ALJ's error was failing to consider additional impairment "even implicitly." *Id.* at 1182.

18 Here, where the ALJ did address Zamora's gastrointestinal pain, there is no indication of error.

19 **D. Whether to Remand for Further Proceedings or Calculation of Benefits.**

20     When an ALJ's reasons for rejecting an examining physician's opinion or a claimant's

21 testimony are "legally insufficient and it is clear from the record that the ALJ would be required

22 to determine the claimant disabled" if he had credited the evidence, the proper course is for the

23 Court to remand for a calculation of benefits. *Orn*, 495 F.3d at 640; *see also Ryan*, 528 F.3d at

24 1194. Here, the ALJ improperly disregarded the opinions of two treating physicians, an

25 impartial examining physician, and Zamora himself. He also credited the opinion of a reviewing

26 physician despite the fact that the physician relied on an MRI that is not found in the record and

27 may never have been taken. It is clear, at least with regard to the opinions of the treating

28 physicians, that the ALJ would have been required to find Zamora disabled if he had credited the

13

1  opinion.  The vocational expert testified that based on Dr. Kaisler-Meza's assessment, Zamora
2  would not be fit for employment that exists in sufficient numbers in the national economy.  AR
3  65.  Accordingly, the case remanded for calculation of benefits is appropriate.

4                                    **IV.  ORDER**

5         Good cause therefor appearing, IT IS HEREBY ORDERED that Zamora's motion for
6  summary judgment is GRANTED; the Commissioner's motion for summary judgment is
7  DENIED; and the matter is REMANDED for calculation of benefits.
8  IT IS SO ORDERED.

9

10  DATED: September 27, 2008                    _____

11                                        JEREMY FOGEL
                                          United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5: 09-cv-3273 JF/PVT
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, ETC.
(JFLC3)